# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## CEDAR RAPIDS DIVISION

ESTATE OF EVELYN ZEMAN, by Its
Personal Representative, David Zeman,

      Plaintiff,

      v.

ULI FUNDING LLC,

      Defendant.

Case No. 1:26-cv-00065

**COMPLAINT AND JURY DEMAND**

Plaintiff, the Estate of Evelyn Zeman (the "Estate"), by its personal representative David Zeman, hereby files and submits this Complaint against Defendant ULI Funding LLC ("ULI Funding"), and in support thereof alleges and says:

## NATURE OF THE ACTION

1. This case involves an illegal scheme of stranger originated life insurance ("STOLI") governed by Delaware law. As explained by the Supreme Court of Delaware, "[s]ince the initial creation of life insurance during the sixteenth century, speculators have sought to use insurance to wager on the lives of strangers." *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Trust,* 28 A.3d 1059, 1069 (Del. 2011). In their modern form, STOLI policies are created to satisfy the demand of institutional investors hoping to profit through the acquisition of high-value life insurance policies, rather than serve any legitimate insurance need. Such "STOLI arrangements are unique in that they are not simply void *ab initio*, anathema to hundreds of years of public policy, or violative of the Delaware Constitution, but they boast all three of these unenviable qualities." *Wells Fargo Bank, N.A. v. Est. of Malkin*, 278 A.3d 53, 65 n. 48 (Del. 2022).

2. Under Delaware law, when an insurer pays the death benefit on a STOLI policy, the decedent's estate may recover the policy proceeds from the investor. *See* 18 Del. C § 2704(b).

3. The subject policy was issued by Transamerica Life Insurance Company on the life of Evelyn Zeman ("Ms. Zeman"). Ms. Zeman – already 79- years old at the time the policy was issued – had no need for the Policy. Strangers having no insurable interest in Ms. Zeman's life effectuated the Policy and furnished the premiums used to originate the Policy, and she herself bore no financial risk. Instead, strangers used her capacity to be insured to generate a policy from which they expected to profit either by receiving the policy proceeds when she died, or by selling the policy to yet another stranger.

4. This action seeks to recover the proceeds of the illegal human life wager placed on Ms. Zeman's life. Because the strangers who orchestrated this policy had no insurable interest in Ms. Zeman's life, the policy was an illegal wager that violates Delaware's constitution, Delaware's statutory prohibition against STOLI policies, and centuries of public policy. Pursuant to 18 Del. C. § 2704(b), the Estate is statutorily entitled to disgorge and recover the full policy proceeds from ULI Funding, the downstream investor that received the policy proceeds.

**PARTIES**

5. The Estate is a citizen of the State of Michigan.

6. The Estate was established pursuant to Michigan law following the death of Ms. Zeman, a resident of Michigan.

7. The Estate's personal representative is David Zeman, who is also a resident of Michigan and was appointed by a Michigan probate court to serve as personal representative of the Estate.

8.      Defendant ULI Funding is a limited liability company formed, and with its principal place of business, in Cedar Rapids, Iowa.

9.      On information and belief formed after reasonable inquiry, ULI Funding was the beneficial owner of the Policy and is named as a defendant in this action because ULI Funding received the Policy's proceeds as its beneficial owner, after Transamerica paid the death benefit proceeds to Bank of Utah as the listed beneficiary under the Policy.

## JURISDICTION AND VENUE

10.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

11.     The Estate is being probated in Michigan and is thus a citizen of Michigan for jurisdictional purposes.

12.     Upon information and belief, the members of ULI Funding LLC are citizens of states other than Michigan for jurisdictional purposes.

13.     Venue is proper in the Northern District of Iowa pursuant to 28 U.S.C. § 1391 because ULI Funding resides in this District.

## FACTS

14.     As the Delaware Supreme Court explains:

In a stranger-originated life insurance ("STOLI") scheme, a speculator contrives to purchase a policy on the life of a stranger. If the stranger dies before the value of the premiums paid by the speculator exceeds the death benefit of the policy, the speculator's bet pays off. STOLI policies violate Article II, § 17 of the Delaware Constitution, which prohibits most forms of gambling. They also offend the longstanding public policy of this State. Hence, 18 Del. C. § 2704(b) allows the estate of a deceased STOLI insured to "maintain an action to recover" the death benefit from its recipient.

*Wells Fargo Bank, N.A. v. Estate of Malkin*, 278 A.3d 53, 56 (Del. 2022).

3

15. Around 2004, industry developments "substantially increased the demand for life settlements, but did not affect the supply side, which remained constrained by a limited number of seniors who had unwanted policies of sufficiently high value. As a result, STOLI promoters sought to solve the supply problem by generating new, high value policies." *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Trust,* 28 A.3d 1059, 1069 (Del. 2011).

16. One such STOLI promoter was a family of interrelated entities known generally as "Coventry." At all relevant times, including in 2006, Coventry operated a scheme that successfully generated many STOLI policies. Upon information and belief, Coventry followed that scheme in generating the Policy.

17. Coventry worked with a nationwide network of insurance producers, who, acting as the funders' agents, assisted the funders by, among other things, identifying senior citizens meeting the funders' investment criteria and influencing those seniors to become involved in the STOLI transactions the funders were orchestrating.

18. The STOLI transactions orchestrated by Coventry were presented to these hand-selected senior citizens in rosy terms that camouflaged the transaction's impropriety as being a "risk-free" opportunity, "just a good deal," or as being similar to "hitting the lottery" or acquiring a winning "bingo" card.

19. In Delaware and other places, these STOLI policies not only violate constitutional bans on wagering and insurable interest laws, but they distort the proper use of life insurance—which is to provide actual protection to an insured's family in the event of an untimely death—into a cash machine whereby a stranger to the insured is actually more interested in seeing the insured dead than alive.

4

**Coventry's Non-Recourse Two-Year Premium Financing Scheme**

20.     Upon information and belief, Coventry procured the Policy pursuant to a scheme to originate life insurance policies on the lives of seniors, that were created in order to be acquired by investors promptly after the two-year incontestability period following issuance of the policy had passed.

21.     Before any policy was applied for, Coventry would obtain a broad Special Irrevocable Durable Power of Attorney over the potential insured, giving Coventry the power to originate and/or service any life insurance policies on the insured's life, which powers included, but were not limited to, the power to complete and execute any applications or other documents in connection with the maintenance of the policies or even the "liquidation" of the policies.

22.     Once Coventry determined that a particular insured was a suitable candidate for a policy, Coventry would then dictate the terms under which a policy would be applied for. Coventry, with the assistance of the local insurance brokers, would start the application process by having these local insurance brokers partially complete applications for policies to be issued by insurance carriers chosen by Coventry.

23.     Once an insurance carrier made a preliminary underwriting decision about a particular prospective insured, Coventry would then create a Delaware statutory trust in the insured's name to apply for and become the owner and beneficiary of any potential policy on an insured's life. Coventry would do so by directing the local insurance broker to have the insured execute a number of boilerplate and non-negotiable Coventry trust documents and to nominally fund each Delaware trust, typically with $1.00. The Delaware trusts would have no other assets, and would be established by and for Coventry pursuant to forms expressly stating that they were not intended to serve any valid estate planning need for the insureds.

24. Coventry would also have the insureds execute separate trust agreements whereby Coventry would create a second Delaware trust for each policy, called a sub-trust. Under the terms of the sub-trust agreements, all assets of the initial trusts were immediately transferred and assigned to the sub-trusts, including any and all future rights or interests in any life insurance policy procured by Coventry through the Delaware trusts, on the insured's life.

25. Coventry would choose the Delaware trust's trustee, which in most, if not all, cases was Wilmington Trust, a corporate trustee located in Delaware. Coventry's form trust agreement granted broad powers to Coventry's chosen trustee, including the ability to cause the sub-trust to enter into a so-called "loan" whereby Coventry would pay all premiums for any policy on the prospective insured's life. The trustee was also given the power to assign the sub-trust's assets, including any future interest in any life insurance policy, to Coventry.

26. Once this was all in place, Coventry, acting through its local insurance broker, would cause the broker to submit a formal application to the insurance carrier that had been selected by Coventry. The formal application would identify the Delaware trust in the insured's name as both the owner and beneficiary of the policy being applied for; explain that the trust had been formed in Delaware; and further explain that the initial application was signed by the insured and the trustee in Delaware. The formal application would also identify the name of the Delaware corporate trustee, with an address in Delaware. Many such applications were signed on Wilmington Trust Company's behalf by its Financial Services Officer, Michelle C. Harra.

27. The formal application would not, however, identify the existence of the sub-trust; Coventry's involvement in the transaction; the fact that Coventry was actually paying the policy's premiums; the fact that Coventry was receiving consideration, including half of the commissions; or the fact that Coventry had previously entered into a series of contracts (i.e., the Origination

Agreements) under which it was engaged (indeed required) to "originate" life insurance policies for resale to other investors.

28.     The policy itself would then be issued by the Coventry-selected insurance carrier for delivery to the Delaware corporate trustee of the Delaware trust owner. The Delaware corporate trustee would then execute a policy delivery receipt in Delaware, acknowledging actual physical delivery and legal acceptance of the terms of the policy in Delaware, thus creating a Delaware trust-owned insurance policy controlled by Delaware law.

29.     Through its so-called "loan" with the sub-trust, Coventry would then pay the policy's premium by wire transfer, which allowed Coventry to continue to conceal its involvement in the origination and procurement of the policy. Under the terms of Coventry's "loan," Coventry obtained an immediate assignment of and control over, among other things, any policy issued to the trust and conveyed to the sub-trust.

30.     But the so-called "loan" to the sub-trust was a sham. It was structured with a 26- or 30-month term with no genuine obligation for anyone to repay and no recourse to the insured. The "loan" otherwise carried excessive interest, fees, and expenses, and was in effect designed to discourage its repayment. Indeed, the "loan" did not need to be repaid at all. Instead, the "loan" was designed so that at the end of the term, all rights and interests in both the Delaware Trust that owned the policy and the sub-trust—specifically including all rights and interests in the policy— could simply be irrevocably relinquished to Coventry in full satisfaction of the "loan" and then sold by Coventry to another investor. Alternatively, the policy in question could be sold to Coventry or another investor for an amount in excess of the loan balance, with the sale proceeds being used to repay the loan. Either way, as intended, the policy was acquired by an investor, who either kept the policy to maturity or sold it to another investor.

31. Numerous courts have held, as a matter of law, that policies originated under this Coventry program constitute STOLI schemes in which an insurable interest in the policy was lacking at inception. *See, e.g.*, *Est. of Berland by Gilman v. Lavastone Cap. LLC*, 2022 WL 15023450 (D. Del. Sept. 28, 2022); *Estate of Barotz v. Vida Longevity Fund, L.P.*, 2022 WL 16833545 (Del. Super. Ct. Nov. 9, 2022), *aff'd*, 320 A.3d 212 (Del. 2024); *Sun Life Assurance Co. Canada v. U.S. Bank Nat'l Ass'n*, 369 F. Supp. 3d 601 (D. Del. 2019) ("*Sol*"); *Sun Life Assurance Co. of Canada v. U.S. Bank Nat'l Ass'n*, 2016 WL 161598 (S.D. Fla. Jan. 14, 2016), *aff'd in relevant par*t, 693 F. App'x 838 (11th Cir. June 12, 2017); *U.S. Bank Nat'l Ass'n v. Sun Life Assurance Co. of Canada*, 2016 WL 8116141 (E.D.N.Y. Aug. 30, 2016), *report and recommendation adopted*, 2017 WL 347449 (E.D.N.Y. Jan. 24, 2017).

**The Origination of the Policy Pursuant to the Coventry Scheme**

32. In January 2006, Coventry procured an adjustable life insurance policy (the "Policy") on the life of Evelyn Zeman ("Ms. Zeman") from Transamerica Occidental Life Insurance Company ("Transamerica") with policy number 60132801.

33. The initial face amount of the Policy was $1.1 million.

34. At the time, Ms. Zeman was 79 years old.

35. Upon information and belief, Ms. Zeman neither wanted nor needed this life insurance for any bona fide insurance or estate planning purpose. Instead, Coventry procured the Policy as part of its wide-ranging scheme to generate STOLI policies as investment vehicles, and the Policy was structured as a wager on Ms. Zeman's life.

36. Upon information and belief, the scheme that generated the Policy resembled in all relevant respects, and utilized the same *modus operandi*, as the policies described above.

8

37. To facilitate issuance of the Policy, Coventry created a Delaware trust called the Evelyn Zeman Life Insurance Trust dated January 12, 2006 (the "Insurance Trust"), installed a Delaware corporate trustee named Wilmington Trust Company as the Insurance Trust's trustee, and used the Trust as a cover to procure the Policy without a valid insurable interest.

38. As part of the application process, Wilmington Trust Company provided a "Verification of Irrevocable Trust Agreement for Administration of Life Insurance Policies."

39. The verification was signed by Michele C. Harra on behalf of Wilmington Trust Company in Wilmington, Delaware.

40. The policy application was likewise signed by Michele C. Harra in Wilmington, Delaware, in her capacity as Financial Services Officer, on behalf of the applicant and policy owner, the Insurance Trust.

41. Upon information and belief, the Policy was issued to the Trust and delivered to Wilmington Trust, as trustee of the Insurance Trust, at Wilmington Trust's address in Wilmington, Delaware.

42. Ms. Zeman was never personally responsible to pay the premiums needed to maintain the Policy.

43. The Insurance Trust was the initial beneficial owner of the Policy.

44. Upon information and belief, Wilmington Trust, at the direction of Coventry, later directly or indirectly transferred the Insurance Trust's beneficial interest in the Policy, and the beneficial interest in the Policy was ultimately acquired by ULI Funding.

45. ULI Funding designated Bank of Utah as its securities intermediary to serve as the record owner of the Policy. However, ULI Funding remained the beneficial owner of the Policy.

46. Ms. Zeman passed away in September 2023.

9

47. On information and belief, following Ms. Zeman's death, Bank of Utah submitted a claim to Transamerica for the Policy's death benefit on behalf of ULI Funding.

48. On information and belief, Transamerica paid the Policy's death benefit to Bank of Utah in its capacity as securities intermediary for ULI Funding.

49. Upon information and belief, ULI Funding continues to possess and/or control the Policy proceeds.

## FIRST CAUSE OF ACTION: RECOVERY OF INSURANCE PROCEEDS DUE TO LACK OF INSURABLE INTEREST

50. The Estate hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length.

51. Delaware law governs the Policy and this action under 18 Del. C.§ 2704(g) because the insurance policy at issue was delivered to a Delaware trust company located in Wilmington, Delaware, acting as the trustee of the Trust.

52. The Delaware Insurance Code provides, among other things, that "no person shall procure or cause to be procured any insurance contract upon the life or body of another individual unless the benefits under such contract are payable to the individual insured or his or her personal representatives or to a person having, at the time when such contract was made, an insurable interest in the individual insured." 18 Del. C. § 2704(a).

53. This insurable interest requirement is not satisfied where a third party without insurable interest uses an insured as an instrumentality to procure a policy for itself as a wager on the insured's life. *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Trust*, 28 A.3d 1059 (Del. 2011).

54. Where an insurance company pays the death benefit on a policy lacking insurable interest, the estate of the insured is entitled to recover such benefits from the beneficiary, assignee, or payee as a matter of common law and statute. 18 Del. C. § 2704(b).

55. The Policy at issue in this case was procured without insurable interest on Ms. Zeman's life.

56. The Policy's death benefit was paid, transferred, or otherwise assigned to ULI Funding or entities related to them.

WHEREFORE, the Estate demands that the Court enter judgment in favor of the Estate and against ULI Funding in the sum of the full Policy proceeds, together with prejudgment interest and costs, and such other and further relief as the Court deems just and proper.

## **TRIAL BY JURY DEMANDED**

Pursuant to Federal Rule of Civil Procedure 38(b), the Estate hereby demands a trial by jury on all issues so triable.


Dated: March 25, 2026

Respectfully submitted,

LEDERER WESTON CRAIG, PLC

/s/    *Gregory M. Lederer*
Gregory M. Lederer  AT0004668
118 Third Avenue SE, Suite 700
Cedar Rapids, IA 52401
Tel: 319-365-1184
Fax : 319-365-1186
Email: glederer@lwclawyers.com

WALDEN MACHT HARAN & WILLIAMS LLP
Daniel R. Miller (*pro hac* motion to be filed)
Jonathan Z. DeSantis (*pro hac* motion to be filed)
2000 Market Street, Suite 1430
Philadelphia, PA  19103
Tel:  (215) 825-5280
E-mail:  dmiller@wmhwlaw.com
E-mail:  jdesantis@wmhwlaw.com

Daniel A. Cohen (*pro hac* motion to be filed)
250 Vesey Street, 27th Floor
New York, NY  10281
Tel:  (212) 335-2030
E-mail:  dcohen@wmhwlaw.com

ATTORNEYS FOR PLAINTIFF